UNITED STATES BANKRUPTCY COURT
MIDDLE DISTRICT OF FLORIDA
ORLANDO DIVISION

In re:                                    CASE NO. 6:09-bk-06245-KSJ

KA AND KM DEVELOPMENT, INC.,              CHAPTER 11

        Debtor.

_____

## AMENDED DISCLOSURE STATEMENT, PURSUANT TO 11 U.S.C. §1125, FOR KA AND KM DEVELOPMENT, INC.

COUNSEL FOR DEBTOR

ELIZABETH A. GREEN, ESQ.
JIMMY D. PARRISH. ESQ.
BAKER & HOSTETLER LLP
200 S. ORANGE AVE.
SUNTRUST CENTER, SUITE 2300
ORLANDO, FLORIDA, 32801-3432

FEBRUARY 25, 2010

UNITED STATES BANKRUPTCY COURT
MIDDLE DISTRICT OF FLORIDA
ORLANDO DIVISION

In re:                                    CASE NO. 6:09-bk-06245-KSJ

KA AND KM DEVELOPMENT, INC.,              CHAPTER 11

        Debtor.
_____

AMENDED DISCLOSURE STATEMENT, PURSUANT TO 11 U.S.C. §1125,
FOR KA AND KM DEVELOPMENT, INC.

I.      INTRODUCTION AND SUMMARY

        This Amended Disclosure Statement (the "Disclosure Statement") is filed pursuant to the

requirements of Section 1125 of Title 11 of the United States Code (the "Code"). This Disclosure

Statement is intended to provide adequate information to enable holders of claims in the above-

captioned jointly administered bankruptcy cases (the "Bankruptcy Cases") to make informed

judgments about the Plan of Reorganization (the "Plan") submitted by KA and KM

Development, Inc. ("KA and KM" or "Debtor"). The overall purpose of the Plan is to restructure

the Debtor's liabilities in a manner designed to maximize recoveries to all stakeholders. The

Debtor believes the Plan is reasonably calculated to lead to the best possible outcome for all

creditors in the shortest amount of time and preferable to all other alternatives.

        **THIS DISCLOSURE STATEMENT AND ITS RELATED DOCUMENTS
        ARE THE ONLY DOCUMENTS AUTHORIZED BY THE BANKRUPTCY
        COURT TO BE USED IN CONNECTION WITH THE SOLICITATION
        OF VOTES TO ACCEPT THE PLAN. THIS INTRODUCTION AND
        SUMMARY IS QUALIFIED IN ITS ENTIRETY BY THE REMAINING
        PORTIONS OF THIS DISCLOSURE STATEMENT AND THIS
        DISCLOSURE STATEMENT IN TURN IS QUALIFIED, IN ITS
        ENTIRETY, BY THE PLAN. THE PLAN IS AN INTEGRAL PART OF
        THIS DISCLOSURE STATEMENT AND ANY HOLDER OF ANY CLAIM
        OR INTEREST SHOULD READ AND CONSIDER THE PLAN**

1

CAREFULLY IN LIGHT OF THIS DISCLOSURE STATEMENT IN MAKING AN INFORMED JUDGMENT ABOUT THE PLAN. IN THE EVENT OF ANY INCONSISTENCY BETWEEN THIS DISCLOSURE STATEMENT AND THE PLAN, THE PLAN CONTROLS. ALL CAPITALIZED TERMS USED IN THIS DISCLOSURE STATEMENT SHALL HAVE THE DEFINITIONS ASCRIBED TO THEM IN THE PLAN UNLESS OTHERWISE DEFINED HEREIN.

NO REPRESENTATION CONCERNING THE DEBTOR IS AUTHORIZED OTHER THAN AS SET FORTH HEREIN. ANY REPRESENTATIONS OR INDUCEMENTS MADE, WHICH ARE OTHER THAN AS CONTAINED HEREIN, SHOULD NOT BE RELIED UPON IN ARRIVING AT A DECISION ABOUT THE PLAN.

THE INFORMATION CONTAINED HEREIN HAS NOT BEEN SUBJECT TO AUDIT. FOR THAT REASON, AS WELL AS THE COMPLEXITY OF THE DEBTOR'S BUSINESS AND FINANCIAL AFFAIRS, AND THE IMPOSSIBILITY OF MAKING ASSUMPTIONS, ESTIMATES, AND PROJECTIONS WITH COMPLETE ACCURACY, THE DEBTOR IS UNABLE TO WARRANT OR REPRESENT THAT THE INFORMATION CONTAINED HEREIN IS WITHOUT INACCURACY, ALTHOUGH EVERY REASONABLE EFFORT HAS BEEN MADE TO ENSURE THAT SUCH INFORMATION IS ACCURATE. THIS DISCLOSURE STATEMENT INCLUDES FORWARD LOOKING STATEMENTS BASED LARGELY ON THE DEBTOR'S CURRENT EXPECTATIONS AND PROJECTIONS ABOUT FUTURE EVENTS AND FINANCIAL TRENDS AND ARE SUBJECT TO A NUMBER OF RISKS, UNCERTAINTIES, AND ASSUMPTIONS.

AS TO CONTESTED MATTERS, ADVERSARY PROCEEDINGS, CAUSES OF ACTION, AND OTHER ACTIONS, THE DISCLOSURE STATEMENT SHALL NOT CONSTITUTE OR BE CONSTRUED AS AN ADMISSION OF ANY FACT OR LIABILITY OR WAIVER, BUT RATHER AS A STATEMENT MADE IN SETTLEMENT NEGOTIATIONS.

KA and KM is a debtor under Chapter 11 of the Code in a bankruptcy case pending in the United States Bankruptcy Court for the Middle District of Florida, Orlando Division (the "Bankruptcy Court").

As prescribed by the Code and the Rules, Claims asserted against, and Equity Interests in, the Debtor are placed into "Classes". The Plan designates four (5) separate classes of Claims and

Interests. The Plan contains two (2) Classes of Unsecured Claims. The Plan contains one (1) Class of Secured Claims. The classification of Claims and the treatment of each Class are discussed in detail below.

To the extent the legal, contractual, or equitable rights with respect to any Claim or Interest asserted against the Debtor are altered, modified, or changed by treatment proposed under the Plan, such Claim or Interest is considered "Impaired" and the holder of such Claim or Interest is entitled to vote in favor of or against the Plan. A Ballot for voting in favor of or against the Plan (the "Ballot") will be mailed along with the order approving this Disclosure Statement.

**THE VOTE OF EACH CREDITOR OR INTEREST HOLDER WITH AN IMPAIRED CLAIM OR INTEREST IS IMPORTANT. TO BE COUNTED, YOUR BALLOT MUST BE RECEIVED AT THE ADDRESS AND BY THE DATE SET FORTH IN THE BALLOT.**

---

**VOTING DEADLINE**

The last day to vote to accept or reject the Plan is **Thursday, March 18, 2010**. All votes must be received by the Clerk of the United States Bankruptcy Court for the Middle District of Florida, 135 W. Central Boulevard, Suite 950, Orlando, FL 32801 by 5:00 p.m. (EST) on that day.

---

Upon receipt, the Ballots will be tabulated and the results of the voting will be presented to the Bankruptcy Court for its consideration. As described in greater detail in Section IV of this Disclosure Statement, the Code prescribes certain requirements for confirmation of a plan. The Bankruptcy Court will schedule a hearing (the "Confirmation Hearing") to consider whether the Debtor has complied with those requirements.

The Code permits a court to confirm a plan even if all Impaired Classes have not voted in favor of a plan. Confirmation of a plan over the objection of a Class is sometimes called

"cramdown." As described in greater detail in Section IV of this Disclosure Statement, the Debtor has expressly reserved the right to seek "cramdown" in the event all Impaired Classes do not vote in favor of the Plan.

## II. DESCRIPTION OF DEBTOR'S BUSINESS

A. In General.

KA and KM is Florida corporation formed on March 16, 2005. KA and KM was created to hold, develop, and sell one hundred seventy-six (176) units ("Units") at the Lake Eve Resort ("Lake Eve"), located at 12388 International Drive South, Orlando, Florida 32821 (the "Real Property"). The Units consist of one-, two-, and three-bedroom units currently operated as hotel rooms. Lake Eve's amenities include swimming pools, saunas, a fitness center, a restaurant, a sundry shop, business facilities, among others. Although originally intended to be a condominium project, no declaration of condominium was ever filed or recorded. Accordingly, the Real Property is undivided, owned solely by KA and KM, and operated as a hotel.

An affiliate of the Debtor, Eve Management, Inc. manages Lake Eve's service operations on behalf of the Debtor.[1] In that capacity, Eve Management is responsible for, *inter alia*, operating Lake Eve and maintaining the Real Property. Eve Management collects Lake Eve's hotel proceeds. Based upon its current ownership interests, the Debtor receives one hundred percent (100%) of Lake Eve's revenues.

SunTrust Bank provided the financing for the Debtor to purchase the Real Property and develop Lake Eve. SunTrust Bank retains a valid, first priority Mortgage on the Real Property as well other security as evidenced by the Mortgage, Loan Agreement, and other Loan Documents the "Mortgage Documents").

---

[1] Eve Management was originally formed to manage Lake Eve's service operations on behalf of purchasers of the Units, but currently manages Lake Eve on behalf of KA and KM.

B.    Events Leading to Chapter 11 Filing.

Since the early part of 2007, Florida's real estate and tourism markets have seen unprecedented losses. The Debtor completed construction on Lake Eve at the precipice of the decline in January of 2009, and a Certificate of Occupancy was issued on January 26, 2009. Not surprisingly, the Debtor's business has been drastically affected by the downturn in the real estate and tourism markets. While the Debtor had contracts to sell one hundred fifty-seven (157) out of the one hundred seventy-six (176) Units, the buyers, which consisted of mostly overseas purchasers, were unable to obtain financing. Consequently, the Debtor has failed to consummate a sale of any of the Units and has commenced operating Lake Eve as a hotel.

Between December 22, 2008 and March 9, 2009, sixty-five (65) buyers with contracts for Units filed a lawsuit in the United States District Court for the Middle District of Florida seeking a return of all deposit monies paid to the Debtor in connection with their respective contracts. Faced with the pending lawsuit, no purchasers willing and able to close on Units, and still transitioning into operating Lake Eve as a hotel, the Debtor determined that its best alternative to maximize return to all stakeholders was to seek relief under Chapter 11 of the Code.

C.    Events Subsequent to Chapter 11 Filing.

Since the Petition Date, the Debtor has been continuing to operate its business as debtor-in-possession under Sections 1101(a) and 1108 of the Code. Pursuant to various provisions of the Code, KA and KM has sought and obtained several orders from the Bankruptcy Court intended to facilitate the ongoing operations of the Debtor. Those orders authorized KA and KM to, among other things: (i) use cash collateral subject to secured liens; (ii) authorize the payment of prepetition wage obligations; (iii) retain Baker & Hostetler LLP as Debtor's counsel; and (iv) provide adequate assurance payments for utility service. On June 26, 2009, the United

States Trustee filed its Notice of Appointment of the Official Committee of Unsecured Creditors (the "Committee").

The most significant event subsequent to the Petition Date relates to claims by the Debtor's various deposit claimants ("Deposit Claimants") for deposits placed with the Debtor in connection with purchase contracts for Units at Lake Eve (the "Deposit Funds"). Many of the Deposit Claimants commenced adversary proceedings seeking a determination that the Deposit Funds should be returned to the respective Deposit Claimant. In response, the Debtor commenced objections to the claims of the Deposit Claimants seeking to disallow the respective claims on the grounds that the Deposit Claimants breached their respective purchase agreements and forfeited any Deposit Funds.

On November 17, 2009, the Court entered its Order Directing Mediation ("Mediation") for Contested Matters ("Mediation Order") (Doc. No. 205), which required the Debtor, the Committee, and the Deposit Claimants to mediate the issues related to the respective adversary proceedings and objections to claims. On December 1, 2009, the Debtor, the Committee, SunTrust Bank, and the Deposit Claimants completed the Mediation and the Debtor entered into: (i) that certain Mediation Settlement Agreement (the "Urban Rooney Settlement") dated December 1, 2009 by and between the Debtor, ninety-three (93) Deposit Claimants represented by Urban Their Federal and Jackson, P.A. ("Urban Claimants"), James and Teresa Rooney ("Rooney"), Vinod Kalidas, Nirmaksee Kalidas, and Arti V. Kalidas ("Kalidas Parties"), and Sun Trust Bank; and (ii) that certain Mediation Settlement Agreement (the "Committee Settlement") dated December 1, 2009 by and between the Debtor, SunTrust Bank, the Kalidas Parties, and the Committee. A true and correct copy of the Urban Rooney Settlement and the Committee Settlement are attached as exhibits to the Plan.

The terms of the Urban Rooney Settlement and the Committee Settlement form the basis of the terms of the Plan and the terms of the Urban Rooney Settlement and the Committee Settlement are expressly incorporated into the Plan and this Disclosure Statement.

In addition to its settlement discussions and agreements with the Urban Claimants, Rooney, and the Committee, the Debtor and SunTrust have engaged in numerous negotiations, since the Petition Date, to restructure the terms of the SunTrust loan, which matured weeks after the Debtor's Chapter 11 filing.

## III. THE PLAN

**THE FOLLOWING SUMMARY IS INTENDED ONLY TO PROVIDE AN OVERVIEW OF THE DEBTOR'S PLAN. ANY PARTY IN INTEREST CONSIDERING A VOTE ON THE PLAN SHOULD CAREFULLY READ THE PLAN IN ITS ENTIRETY BEFORE MAKING A DETERMINATION TO VOTE IN FAVOR OF OR AGAINST THE PLAN. THIS SUMMARY IS QUALIFIED IN ITS ENTIRETY BY THE PLAN.**

A. Overview.

In summary, the Plan contemplates emergence of a Reorganized Debtor through the continued operation of the business. All Claims against the Reorganized Debtor shall be classified and treated pursuant to the terms of the Plan. As noted more fully below, the Plan contains four (4) Classes of Claims and Interests. There is one (1) Class of Secured Claims, two (2) Classes of Unsecured Claims, and one (1) Class of Interests.

Overall, the Plan provides that holders of Allowed Administrative Claims will be paid in full on the Effective Date. Except as expressly stated in the Plan, the Reorganized Debtor will pay holders of Allowed Priority Claims over time, with interest, over a period of five years from the Petition Date with interest at five percent (5%).

The Holder of the Allowed Class 1 Claim, will retain its lien and will receive payments equal to one hundred percent (100%) of its Allowed Secured Claim, over time, according to the terms set forth herein and in the Plan. Each Holder of an Allowed Class 2 Claim shall receive on the Effective Date an amount equal to the unit amount currently held in escrow for such Holder (the amount listed for that Holder on Exhibit "A" to the Bankruptcy Court's 11/23/2009 Order "Deposit in Escrow" column) or as determined by the Court, plus payment of such Holder's Allowed Priority Claim as set forth herein and in the Plan, and entitlement to a pro rata share (based such Holders Allowed Claim less amounts received on the Effective Date for return of deposit and for priority claim) of the $50,000 Unsecured Creditors' Fund ("Unsecured Creditors' Fund"). Each Holder of an Allowed Class 3 Claim shall elect to receive either: (i) on the Effective date one hundred percent (100%) of the unit amount currently held in escrow for such Holder (the amount listed for that Holder on Exhibit "A" to the Bankruptcy Court's 11/23/2009 Order "Deposit in Escrow" column or as otherwise determined by the Court)("Class 3 Unit Amount"); or (ii) seventy-five percent (75%) of the Class 3 Unit Amount, plus a pro rata share of the Unsecured Creditors' Fund, plus a share of amounts realized by the Kalidas Parties on account of their one hundred percent (100%) equity interest in the Reorganized Debtor as set forth herein and in the Plan. The Holders of Class 4 General Unsecured Claims will receive a pro rata share of the Unsecured Creditors' Fund. The Holders of Allowed Class 5 Equity Interests will retain their interest in the Debtor. Accordingly, all Classes, except Class 5 are Impaired under the Plan.

B.    Classification and Treatment of Claims.

     1.    Priority Claims.

        a.    Administrative Expense Claims.

Holders of all Allowed Administrative Expense Claims of the Debtor shall be paid in full on the Effective Date or in accordance with existing credit or repayment terms. Debtor's cash-on-hand, as of the Effective Date, shall be used to pay Allowed Administrative Expense Claims.

        b.    Priority Tax Claims.

Except to the extent that the Holder and the Reorganized Debtor have agreed or may agree to a different treatment, each Holder of an Allowed Priority Tax Claim shall receive from the Reorganized Debtor, in full satisfaction of such Claim, payments equal to the Allowed Amount of such Claim. Allowed Priority Tax Claims will be paid the effective date of the Plan.

     2.    Secured Claims.

        a.    Class 1 — SunTrust Bank.

Class 1 consists of the Allowed Secured Claim of SunTrust Bank related to that certain Mortgage Note dated June 21, 2007 in the original principal amount of $43,260,000.00. The total Allowed Class 1 Secured Claim is estimated in the amount of $38,719,005.70 and is secured by the existing, valid first mortgage on the Real Property of the Debtor along with other collateral, as well as a first priority lien in the Debtor's Cash Collateral, hotel receipts, and accounts receivable.

In full satisfaction of SunTrust Bank's Allowed Class 1 Secured Claim, SunTrust Bank shall retain its liens and receive the following: The existing note will be amended and bifurcated into (i) the A Note; and (ii) the B Note. The A Note and the B Note will

include additional terms, and are to be secured by the Mortgage Documents dated June 21, 2007 and all other prior security interest arrangements between the Debtor and SunTrust Bank, which will remain in full force and effect. If requested by SunTrust Bank, the Mortgage Documents will be modified and additional documents may be executed to provide SunTrust Bank with additional collateral. After confirmation, SunTrust Bank may record or otherwise perfect any modifications to the Mortgage Documents or additional security documents. The Debtor, the Debtor's principals, and SunTrust Bank will execute such documents as are reasonably required for the restructuring of the loan.

SunTrust Bank shall retain as additional security for the debt a deed in lieu of foreclosure to SunTrust Bank or its assigns executed by Debtor (and which does not constitute the discharge of any debt) as security which SunTrust Bank shall hold in escrow and may only record pursuant to the terms to be agreed by Debtor and SunTrust Bank at a later date; furthermore, at confirmation SunTrust Bank and the Debtor will enter into a settlement agreement and agree to a stipulated foreclosure judgment in the event of default.

SunTrust Bank will apply a portion of Nirmaksee Kalidas' personal account at RBC Bank, which was pledged to SunTrust Bank, against the balance of the B Note upon confirmation, to be determined based on the amount of the A Note, while the remaining funds from that account will be used to create an operating reserve account for the Debtor which may be used for payments on the A Note in SunTrust Bank's discretion. The Kalidas Parties will reaffirm any existing personal guarantees of the debt, and Eve Management, Inc., will further provide a corporate guaranty and will subordinate its management agreement to the Mortgage Documents.

Any monies held in escrow by SunTrust Bank pursuant to the Order of this Court dated November, 23, 2009, and that are not to be distributed to any third party Deposit Claimants under the terms of this Plan, SunTrust Bank shall apply to the principal of the B Note, at closing or as otherwise available. In addition, a renewal fee of $353,000.00 will be added to the balance of the B Note along with unpaid, accrued interest (at this time, approximately $499,584.39) which will be added as principal to the balance of the B Note.

On the first day of the month following the Effective Date, the Reorganized Debtor shall commence monthly interest - only payments to SunTrust Bank on the A Note based upon an interest rate equal to Bloomberg One Month LIBOR plus three hundred (300) basis points. The interest rate on the A Note shall have a floor of six percent (6%) and a ceiling of seven and a half percent (7.5%). Failure to make the appropriate monthly payments on the A Note will constitute a default by Debtor. The term of the A Note shall be three (3) years, with an automatic one (1) year extension if the Reorganized Debtor is not in default on either the A Note, the B Note, or any of its obligations to SunTrust Bank pursuant to the Mortgage Documents, statute, this Plan, or other law.

On the first day of the month following the Effective Date, the Reorganized Debtor shall commence monthly payments to SunTrust Bank on the B Note based upon an interest rate equal to Bloomberg One Month LIBOR plus three hundred (300) basis points. The monthly payments will be based on the prior month's cash flow after all operating expenses, and a minimum targeted level of cash working capital. Debtor and SunTrust Bank will mutually agree upon the minimum monthly target for cash working capital. Each month, funds in excess of the cash working capital target will be applied to the accrued, unpaid interest on the B Note. If all accrued, unpaid interest is brought current, then monthly payments will pay

current monthly interest and any excess funds will be applied to the principal balance of the B Note. Any interest unpaid in any given month will accrue. All unpaid accrued interest will be due on maturity. The interest rate on the B Note shall have a floor of six percent (6%) and a ceiling of seven and a half percent (7.5%). Failure to make the appropriate monthly payments on the B Note when the Debtor has met its cash working capital target will constitute a default by Debtor. The term of the B Note shall be three (3) years, with an automatic one (1) year extension if the Reorganized Debtor is not in default on either the A Note, the B Note, or any of its obligations to SunTrust Bank pursuant to the Mortgage Documents, statute, this Plan, or other law.

The automatic extension for the A Note and the B Note will be subject to a 1% extension fee based on the total outstanding principal at the time of the extension, and which will be added to the principal of the B Note as of the date of the extension. The A Note and B Note are dependent obligations and are to have cross-default provisions.

      b.    <u>Class 2 – Urban Rooney Claims.</u>

Class 2 consists of the Allowed Claims of the Urban Rooney Claimants. The Urban Rooney Claimants assert secured, priority, and unsecured claims based upon deposits placed with the Debtor. The Mediation Settlement Agreement (Urban Plaintiffs and Rooney) entered into on December 1, 2009 sets forth the treatment of the Claims of the Urban Rooney Claimants and is incorporated by this reference into the Plan. In summary, each Holder of an Allowed Class 2 Unsecured Claim shall receive on the Effective Date: (i) an amount equal to the unit amount currently held in escrow for each such Holder (the amount listed for that Holder on Exhibit "A" to the Bankruptcy Court's 11/23/2009 Order "Deposit in Escrow" column ($30,900.00 for line 163 is to be dispursed to Unit 804 on line 80), or as otherwise determined by the Court; plus (ii) payment of such Holder's Allowed Priority Claim in the

amount of $2,425.00; plus (iii) an entitlement to a pro rata share (based each such Holder's Allowed Claim less amounts received on the Effective Date for return of deposit and for priority claim) of the $50,000.00 Unsecured Creditors' Fund.

c.    Class 3 – Claims of Remaining Unit Purchasers.

Class 3 consists of the Allowed Claims of the Remaining Unit Purchasers. The Mediation Settlement Agreement (Official Committee of Unsecured Creditors) entered into on December 1, 2009 generally sets forth the treatment of the Claims of the Remaining Unit Purchasers and is incorporated by this reference into the Plan, subject to the additional terms set forth herein.

The Claims of the Remaining Unit Purchasers shall be treated as follows:

1.    The Ballot will specify that each Remaining Unit Purchaser shall select one of the two options below in settlement of such Remaining Unit Purchaser's Claim. In the event that a Remaining Unit Purchaser fails to make a selection, such Remaining Unit Purchaser shall be treated as selecting Option 1 below. The two options are as follows:

a.    Option 1:

i.    On the Effective Date, the Escrow Agent shall pay such Remaining Unit Purchaser 100% of the amount listed for such Remaining Unit Purchaser in the column marked "Deposit in Escrow" on Exhibit "A" to the SunTrust Escrow Agreement in Cash from the Escrow Funds.

ii.    Such Remaining Unit Purchaser will have an Allowed Unsecured Claim in the amount of such Remaining Unit Purchaser's Total Deposit, less the amounts received under subparagraph i. hereunder, to be paid pro rata from the Unsecured Creditors' Fund.

b.     Option 2:

i.     On the Effective Date, the Escrow Agent shall pay each Option 2 Remaining Unit Purchaser 75% of the amount listed for such Option 2 Remaining Unit Purchaser in the column marked "Deposit in Escrow" on Exhibit "A" to the SunTrust Escrow Agreement in Cash from the Escrow Funds.

ii.     Such Option 2 Remaining Unit Purchaser will have an Allowed General Unsecured Claim in the amount of such Option 2 Remaining Unit Purchaser's Total Deposit, less the amounts received under subparagraph i. hereunder, to be paid pro rata from the Unsecured Creditors' Fund.

iii.     Such Option 2 Remaining Unit Purchaser shall receive the following:

1)     Until payments to each Option 2 Remaining Unit Purchaser received pursuant to the provisions in Option 2 equals the Limit for such Option 2 Remaining Unit Purchaser, the Kalidas Parties shall pay fifty percent (50%) of all Kalidas Distributions to the Remaining Unit Purchaser Escrow Agent for the benefit of the Option 2 Remaining Unit Purchasers, provided that the SunTrust Loan has been paid in full. The remaining fifty percent (50%) of the Kalidas Distributions shall be retained by the Kalidas Parties. In the event of a Debtor Sale, after payment to SunTrust Bank of the amounts owed pursuant to the SunTrust Loan, regardless of whether Kalidas Distributions are made, the remaining proceeds of the Debtor Sale after such payment to SunTrust Bank shall be deemed Kalidas Distributions. No monies or other compensation whatsoever other than Compensation and Management Fees shall be paid to the Kalidas Parties until the SunTrust Loan is paid in full.

2)      Within thirty (30) days after the Remaining Unit Purchaser Escrow Agent receives any Option 2 Payments, the Remaining Unit Purchaser Escrow Agent shall deliver to each Option 2 Remaining Unit Purchaser, until the Limit is reached for the Option 2 Remaining Unit Purchaser, an amount equal to the product of the amount of such Option 2 Payments multiplied by a fraction, the numerator of which is the Limit for the Option 2 Remaining Unit Purchaser and the denominator of which is the aggregate of the Limits of all Option 2 Remaining Unit Purchasers.

3)      Until payments to each Option 2 Remaining Unit Purchaser pursuant to the provisions in this Option 2 equals the Limit for such Option 2 Remaining Unit Purchaser, within thirty (30) days after March 31st of each year beginning on March 31, 2011, the Kalidas Parties shall deliver to the Remaining Unit Purchaser Escrow Agent the Debtor Reports for the immediately preceding year.

4)      The Remaining Unit Purchaser Escrow Agent's duties hereunder shall be limited to those specifically set forth in this Option 2. No implied duties shall be read into this Plan against the Remaining Unit Purchaser Escrow Agent. The Remaining Unit Purchaser Escrow Agent may act in reliance upon any writing, document or signature that it, in good faith, believes to be genuine; may assume the validity and accuracy of any statement or assertion contained in such writing or document; and may assume that any person purporting to give any writing, notice, advice or instruction in connection with the provisions of this Option 2 has been duly authorized to do so. The Remaining Unit Purchaser Escrow Agent shall not be liable in any manner for (a) the sufficiency; correctness as to form, manner or execution; or validity of any document; (b) the identity, authority or right of any

person executing the same; or (c) any mistakes of fact, error of judgment or any acts or omissions of any kind unless caused by its willful misconduct or gross negligence.

5) The Remaining Unit Purchaser Escrow Agent may consult legal counsel satisfactory to it, including counsel to the Committee or counsel for any of the other parties to this Plan. The opinion of such counsel shall be full and complete authorization and protection in respect of any action taken, suffered or omitted by the Remaining Unit Purchaser Escrow Agent pursuant to this Plan in good faith and in accordance with the opinion of such counsel.

6) If any Option 2 Remaining Unit Purchaser, the Kalidas Parties, and/or the Remaining Unit Purchaser Escrow Agent are in disagreement about the rights and obligations of, or the propriety of any action contemplated by the Remaining Unit Purchaser Escrow Agent pursuant to the Plan, the Remaining Unit Purchaser Escrow Agent may, in its sole discretion, file an action in interpleader in the Bankruptcy Court to resolve the disagreement. The Remaining Unit Purchaser Escrow Agent shall be fully protected in suspending all or a part of its activities pursuant to this Plan until a final determination of the Bankruptcy Court. If it is determined that the Kalidas Parties have violated the provisions of Article V(D)(1)(b)(iii), the Remaining Unit Purchaser Escrow Agent shall be entitled to petition the Courts for Orange County, Florida, for specific performance of the Kalidas Parties' responsibilities hereunder and for the assessment of damages and penalties against the Kalidas Parties.

7) The Option 2 Remaining Unit Purchasers, other than the Remaining Unit Purchaser Escrow Agent, hereby jointly and severally agree to indemnify the Remaining Unit Purchaser Escrow Agent and hold it harmless from any

and all claims, liabilities, losses, actions, suits or proceedings at law or in equity, or any other expenses, fees, or charges of any character or nature, that the Remaining Unit Purchaser Escrow Agent may incur or with which it may be threatened by reason of its acting pursuant to this Plan, including attorneys' fees at all trial and appellate levels and the costs of defending any action, suit or proceeding or resisting any claim.

8)    The Option 2 Remaining Unit Purchasers hereby jointly and severally agree to reimburse the Remaining Unit Purchaser Escrow Agent for its out-of-pocket expenses incurred in the administration of the escrow arrangement contained in this Option 2.

9)    At any time that a person is serving as Chair of the Committee, such Chair shall be the Remaining Unit Purchaser Escrow Agent. Upon dissolution of the Committee, the Chair of the Committee shall serve as the Remaining Unit Purchaser Escrow Agreement until such time as such person resigns or is deceased. The Option 2 Remaining Unit Purchasers shall select (by majority vote of the Option 2 Remaining Unit Purchasers) the successor Remaining Unit Purchaser Escrow Agent, who shall serve until such time as a duly-elected successor is thereafter elected by the Option 2 Remaining Unit Purchasers. If a successor escrow agent is not appointed within 30 days of the date on which no person is serving as Chair of the Committee, any Option 2 Remaining Unit Purchaser may petition the Bankruptcy Court to name a successor.

10)    Until payments to each Option 2 Remaining Unit Purchaser pursuant to this Option 2 equals the Limit for such Option 2 Remaining Unit Purchaser, regardless of when the SunTrust Loan is paid, the restrictive and

negative covenants in the Mortgage Documents and other loan documents, including the guaranties of the Kalidas Parties, shall continue to apply to Debtor and the Kalidas Parties.

11) At such time as the Option 2 Payments equal in the aggregate $2,250,000.00, the provisions of Article V(D)(1)(b)(iii) shall terminate and be of no further force or effect whatsoever.

iv. <u>Lowest Room Rate</u>: During the period that Debtor owns the Real Property and offers rooms in the building constructed thereon for rent on a nightly basis in the ordinary course of business, Debtor shall at all times offer each Option 2 Remaining Unit Purchaser the lowest room rate offered by the Debtor at any given time (including rates offered to corporate and association clients), provided that the Option 2 Remaining Unit Purchaser books the room at least 15 days in advance and that a room is available at the time that the reservation is made. This arrangement is subordinated to the Mortgage Documents and will remain in place until there is any change in ownership of the Debtor or change in ownership of the Real Property, at which point the arrangement terminates.

v. <u>Termination of Contracts</u>. All Remaining Unit Purchasers are released from any contractual obligations under purchase contracts for condominium unit(s) in the building constructed on the Real Property and such contracts are null and void.

3. <u>Class 4 – General Unsecured Claims.</u>

Class 4 consists of the unsecured claims of Holders of Unsecured Claims, including trade creditors but excludes Claims of the Urban Rooney Claimants and Claims of the Remaining Unit Purchasers. The Holders of General Unsecured Claims will be paid a pro rata share of the Unsecured Creditors Fund in full satisfaction of their claims.

4.      <u>Class 5 - Equity Interests.</u>

Class 5 is unimpaired. Class 5 consists of the ownership interest of the Kalidas Parties. The Kalidas Parties shall retain their respective ownership interest in Debtor.

C.     <u>Means of Implementation.</u>

1.      <u>Chicago Title Payment.</u>

The Plan contemplates a payment in the amount of $50,000 from Chicago Title ("Chicago Title Payment"), which will constitute consideration for releases provided for in the Plan. It is the Debtor's belief that payment of the Chicago Title Payment is integral part of the Plan and will provide funding of the Unsecured Creditors' Fund.

2.      <u>Kalidas Payment.</u>

The Plan contemplates a payment in the amount of $225,000 from the Kalidas Parties, which will constitute new value and consideration for releases provided for in the Plan. It is the Debtor's belief that payment of the Kalidas Payment is integral part of the Plan and will assist the Reorganized Debtor in making payments contemplated under the Plan.

3.      <u>Business Operations and Cash Flow.</u>

The Reorganized Debtor will continue to operate its business. The Debtor believes cash flow from the continued operation of the business along with receipt of the Chicago Title Payment and the Kalidas Payment will be sufficient to meet all required Plan Payments.

4.      <u>Funds Generated During Chapter 11.</u>

Funds generated from operations until the Effective Date will be used for operational expenses and Plan Payments.

5.    Management and Control of the Reorganized Debtor.

a.    Directors. The operations of the Reorganized Debtor shall be overseen by its Board of Directors. The Board of Directors shall have the power to request and obtain all financial data and operational information regarding the Reorganized Debtor at any time. The Board of Directors shall have all corporate authority vested in boards of directors under the applicable laws of the State of Florida including the power to appoint and terminate officers and to liquidate the Reorganized Debtor and to wind up its affairs, with all such powers to be exercised by a majority vote.

The initial Directors shall be Vinod Kalidas, Arti Kalidas, and Nirmaksee Kalidas and each shall continue to serve until either: (i) the Reorganized Debtor ceases to do business; or (ii) a Director resigns or is replaced by the shareholders in accordance with Florida law.

b.    Officers.   No officer of Reorganized Debtor shall have the authority to sell substantially all of the assets of Reorganized Debtor or to liquidate the Reorganized Debtor unless a majority of the Directors of the Reorganized Debtor approves such actions. Should a majority of the Directors of the Reorganized Debtor instruct the officers of Reorganized Debtor to take such actions, the officers of Reorganized Debtor shall follow such instructions to the best of their abilities.

Vinod Kalidas shall be the President of the Reorganized Debtor and shall receive an annual salary of $100,000.   Arti Kalidas shall be the secretary of the Reorganized Debtor and shall receive an annual salary of $60,000.   Nirmaksee Kalidas shall be the Treasurer of the Reorganized Debtor and will not receive an annual salary.   The Reorganized Debtor and Eve Management, Inc. will not adjust the compensation of any officer of the company at any time after the Effective Date without the agreement of SunTrust Bank. As of the

date of this Disclosure Statement, the Debtor is current on its post petition officer's salary obligations.

c.    <u>Stock in the Reorganized Debtor.</u>    After Confirmation, the common stock of the Equity Holder shall remain in full force and effect as set forth herein and in the Plan.

D.    <u>Other Provisions.</u>

To the extent the Debtors reject any executory contract or unexpired lease prior to the Confirmation Date, any party asserting a Claim, pursuant to Section 365 of the Code, arising from the rejection of an executory contract or lease shall file a proof of such Claim within thirty (30) days after the entry of an Order rejecting such contract or lease, and any Allowed Claim resulting from rejection shall be a Class 3 Claim except as otherwise provided herein. The Debtor shall have through and including the hearing on Confirmation within which to assume or reject any unexpired lease or executory contract; and, further, that in the event any such unexpired lease or executory contract is not assumed (or subject to a pending motion to assume) by such date, then such unexpired lease or executory contract shall be deemed rejected as of the Confirmation Date. The Plan also provides for the Bankruptcy Court to retain jurisdiction as to certain matters as stated in the Plan, including, without limitation, prosecution of all Causes of Action and objection to Claims.

## IV.    CONFIRMATION.

A.    <u>Confirmation Hearing.</u>

Section 1128 of the Code requires the Court, after notice, hold a Confirmation Hearing on the Plan at which time any party in interest may be heard in support of or in opposition to Confirmation. The Confirmation Hearing may be adjourned from time to time without further notice except for an announcement to be made at the Confirmation Hearing. Any

objection to Confirmation must be made in writing and filed with the Clerk, and delivered to the following persons, at least seven (7) days prior to Confirmation Hearing:

Counsel for Debtor:

Elizabeth Green, Esquire
Baker & Hostetler LLP
200 S. Orange Ave.
SunTrust Center, Suite 2300
Orlando, Florida 32801-3432

KA and KM Development, Inc./Debtor:

Vinod Kalidas
8865 Commodity Circle, Suite 14B
Orlando, FL 32819

United States Trustee:

Attn: Elena Escamilla, Esquire
135 W. Central Blvd., Suite 620
Orlando, FL 32801

B.     Financial Information Relevant to Confirmation.

Attached as Exhibits, and incorporated herein, are the following:

(i)     **Exhibit "A"** is a copy of Debtor's financial projections for the first three (3) years of Plan Payments. The projections indicate that the Reorganized Debtor's operational cash flow will be sufficient to service the required Plan Payments at a debt level as described herein; and

(ii)     **Exhibit "B"** is a copy of the Debtor's Chapter 7 liquidation analysis (the "Liquidation Analysis") establishing that the Creditors of the Debtor will fair materially poorer in the event the Debtor is forced into Chapter 7 as compared to the Plan.

C.     Confirmation Standards.

For a plan of reorganization to be confirmed the Code requires, among other things, that a plan be proposed in good faith and comply with the applicable provisions of

Chapter 11 of the Code. Section 1129 of the Code also imposes requirements that at least one class of Impaired Claims accept a plan, that confirmation of a plan is not likely to be followed by the need for further financial reorganization, that a plan be in the best interests of creditors, and that a plan be fair and equitable with respect to each class of Claims or Interests which is Impaired under the plan.

The Bankruptcy Court shall confirm a plan only if it finds that all of the requirements enumerated in Section 1129 of the Code have been met. The Debtor believes that the Plan satisfies all of the requirements for Confirmation.

1.  Best Interests Test.

Before the Plan may be confirmed, the Bankruptcy Court must find (with certain exceptions) that the Plan provides, with respect to each Class, that each holder of an Allowed Claim or Interest of such Class either: (a) has accepted the Plan; or (b) will receive or retain under the Plan, on account of such Claim or Interest, property of a value, as of the Effective Date, that is not less than the amount that such holder would receive or retain if the Debtor was, on the Effective Date, liquidated under Chapter 7 of the Code. The Debtor believes that the Liquidation Analysis establishes satisfaction of this test.

To determine what holders of Claims and Equity Interests would receive if the Debtor was liquidated, the Bankruptcy Court must determine how the assets and properties of the Debtor would be liquidated and distributed in the context of a Chapter 7 liquidation case.

The Debtor's costs of liquidation under Chapter 7 would include the fees payable to a trustee in bankruptcy and to any additional attorneys and other professionals engaged by such trustee and any unpaid expenses incurred by the Debtor during the Chapter 11 Case, including compensation of attorneys and accountants. The additional costs and expenses incurred by a trustee in a Chapter 7 liquidation could be substantial and would decrease the

possibility that Unsecured Creditors and holders of Equity Interests would receive meaningful distributions. The foregoing types of Claims arising from Chapter 7 administration and such other Claims as may arise in Chapter 7 or result from the pending Chapter 11 Case would be paid in full from the liquidation proceeds before the balance of those proceeds would be made available to pay the Claims of Unsecured Creditors. Liquidation in Chapter 7 might substantially delay the date at which Creditors would receive any Payment.

The Debtor has carefully considered the probable effects of liquidation under Chapter 7 on the ultimate proceeds available for distribution to Creditors and holders of Equity Interests, including the following:

      a.    the possible costs and expenses of the Chapter 7 trustee or trustees;

      b.    the possible adverse effect on recoveries by Creditors under Chapter 7 due to reduced sale prices for the Debtor's assets caused by the forced Chapter 7 liquidation; and

      c.    the possible substantial increase in Claims, which would rank prior to or on parity with those of Unsecured Creditors.

    2.    Financial Feasibility.

The Code requires, as a condition to Confirmation, that Confirmation of a plan is not likely to be followed by the liquidation or the need for further financial reorganization of the Debtor unless the liquidation is proposed in the Plan. As reflected in **Exhibit "A"**, the Debtor believes that core operations will generate sufficient cash flow to make all Plan Payments as noted herein. Based upon the financial projections, the Debtor asserts that the Plan is feasible and Confirmation is not likely to be followed by further financial reorganization.

3. <u>Acceptance by Impaired Classes.</u>

The Code requires as a condition to Confirmation that each Class of Claims or Interests that is Impaired under the Plan accept such plan, with the exception described in the following section. A Class of Claims has accepted the Plan if the Plan has been accepted by Creditors that hold at least two-thirds (2/3) in dollar amount and more than one-half (1/2) in number of the Allowed Claims of such Class who vote to accept or to reject the Plan.

A Class of Interests has accepted the Plan if the Plan has been accepted by holders of Interests that hold at least two-thirds (2/3) in amount of the Allowed Interests of such Class that vote to accept or reject the Plan. Holders of Claims or Interests who fail to vote are not counted as either accepting or rejecting the Plan.

A Class that is not Impaired under a Plan is deemed to have accepted such Plan; solicitation of acceptances with respect to such Class is not required. A Class is Impaired unless: (i) the legal, equitable, and contractual rights to which the Claim or Interest entitles the holder of such Claim or Interest are not modified; (ii) with respect to Secured Claims, the effect of any default is cured and the original terms of the obligation are reinstated; or (iii) the Plan provides that on the Effective Date the holder of the Claim or Interest receives on account of such claim or interest, Cash equal to the Allowed Amount of such Claim or, with respect to any Interest, any fixed liquidation preference to which the holder is entitled.

4. <u>Confirmation Without Acceptance by all Impaired Classes; "Cramdown."</u>

The Code contains provisions that enable the Court to confirm the Plan, even though all Impaired Classes have not accepted the Plan, provided that the Plan has been accepted by at least one Impaired Class of Claims Section 1129(b)(1) of the Code states:

> "Notwithstanding section 510(a) of this title, if all of the applicable requirements of subsection (a) of this section other than paragraph (8) are met with respect to a plan, the court, on request of the proponent of the

plan, shall confirm the plan notwithstanding the requirements of such paragraph if the plan does not discriminate unfairly, and is fair and equitable, with respect to each class of claims or interests that is impaired under, and has not accepted, the plan."

This section makes clear that the Plan may be confirmed, notwithstanding the failure of an Impaired Class to accept the Plan, so long as the Plan does not discriminate unfairly and it is fair and equitable with respect to each Class of Claims that is Impaired under and has not accepted the Plan.

**THE DEBTOR BELIEVES THAT, IF NECESSARY, IT WILL BE ABLE TO MEET THE STATUTORY STANDARDS SET FORTH IN THE CODE WITH RESPECT TO NONCONSENSUAL CONFIRMATION OF THE PLAN AND WILL SEEK SUCH RELIEF.**

D.    <u>Consummation.</u>

The Plan will be consummated and Payments made if the Plan is Confirmed pursuant to a Final Order of the Court and Plan Distributions commence. It will not be necessary for the Reorganized Debtor to await any required regulatory approvals from agencies or departments of the United States to consummate the Plan. The Plan will be implemented pursuant to its provisions and the Code.

E.    <u>Effects of Confirmation.</u>

1.    <u>Authority to Effectuate the Plan.</u>

Upon the entry of the Confirmation Order by the Bankruptcy Court, the Plan provides all matters provided under the Plan will be deemed to be authorized and approved without further approval from the Bankruptcy Court. The Reorganized Debtor shall be authorized, without further application for an order of the Bankruptcy Court, to take whatever action is necessary to achieve consummation and carry out the Plan in accordance with this Plan and the Code.

2.    Binding Effect of Confirmation.

Confirmation of the Plan will legally bind the Debtor, all Creditors, Interest Holders, and other Parties in Interest to the provisions of the Plan whether or not the Claim or Interest Holder is impaired under the Plan and whether or not such Creditor or Interest Holder voted to accept the Plan.

3.    Discharge of Claims.

To the fullest extent permitted by applicable law, and except as otherwise provided in the Plan, the operative documents implementing the Plan, or the Confirmation Order: (a) on the Effective Date the Confirmation Order shall operate as a discharge under 11 U.S.C. §1140(d)(1) of the Bankruptcy Code, and as a release of any and all Claims, Debts, Liens, Security Interests, and encumbrances of and against the Reorganized Debtor and all Property that arose before Confirmation, including without limitation, any Claim of a kind specified in §§ 502(g), 502(h), or 502(i) of the Bankruptcy Code, and all principal and interest, whether accrued before, on, or after the Petition Date, regardless of whether (i) a Proof of Claim has been filed or deemed filed, (ii) such Claim has been Allowed pursuant to §502 of the Bankruptcy Code, or (iii) the Holder of such Claim has voted on the Plan or has voted to reject the Plan; and (b) from and after the Effective Date (i) all Holders of Claims shall be barred and enjoined from asserting against the Reorganized Debtor and its property any Claims, Debts, Liens, Security Interests, and encumbrances of and against all Property of the Estate, and (iii) the Debtor shall be fully and finally discharged of any liability or obligation on a Disallowed Claim or an Interest. Except as otherwise specifically provided herein, nothing in the Plan shall be deemed to waive, limit, or restrict in any manner the discharge granted upon Confirmation of the Plan pursuant to § 1141 of the Bankruptcy Code.

4.   Judicial Determination of Discharge.

As of the Confirmation Date, except as provided in the Plan, all Persons shall be precluded from asserting against the Debtor any other or further Claims, debts, rights, causes of action, liabilities, or equity interests based on any act, omission, transaction, or other activity of any kind or nature that occurred before the Confirmation Date and the Confirmation Order shall be a judicial determination of discharge of all Claims against Debtor, pursuant to Sections 524 and 1141 of the Bankruptcy Code, and shall void any judgment obtained or entered against Debtor at any time to the extent the judgment relates to discharged Claims.

5.   Injunction.

As part of the Confirmation Order, the Bankruptcy Court shall permanently enjoin and prohibit all Holders of Claims, Liens, Security Interests, Liens, encumbrances rights and Interest in, to or against the Debtor or any of its assets from asserting, prosecuting or collecting such Claims, Liens, Security Interests (other than Liens or Security Interests expressly continued pursuant to the terms of the Plan or the operative documents between the Debtor and the Holder of a Claim regarding the treatment of the Claim under the Plan, including the restructured debt to SunTrust Bank), encumbrances, rights and Interests against the Reorganized Debtor; provided, however, that such injunction shall not apply to any Claim asserted against the Debtor by a claimant based upon a default by the Debtor in performance of its obligations to the claimant under the Plan.

6.   Post-Confirmation Status Report.

Pursuant to the Plan, within 120 days of the entry of the Confirmation Order, the Reorganized Debtor will file status reports with the Bankruptcy Court explaining what progress has been made toward consummation of the confirmed Plan. The status report will be served on the United States Trustee and those parties who have requested special notice post-

confirmation. The Bankruptcy Court may schedule subsequent status conferences in its discretion.

## V.    RELEASES.

### A.    Releases/Injunctions.

The Plan is premised upon the releases contained below. The Debtor asserts the releases are being given to Chicago Title, the Kalidas Parties, and SunTrust (collectively, the "Released Parties") as consideration for the Chicago Title Payment provided by Chicago Title, the Kalidas Payment provided by the Kalidas Parties, and the significant modification of the SunTrust debt under the Plan and are fair consideration for the such payments to be made under the Plan. Moreover, the Debtor believes any Claims or Causes of Action against the Released Parties are subject to substantial defenses and extensive litigation costs and risks. The Debtor further believes that any recovery from such Claims or Causes of Action would be minimal (at best), would require protracted and costly litigation, and the Debtor would not be restructured and reorganized.

From and after the Confirmation Date, the Releases, described in Article VIII in the Plan and Article V herein, shall become effective and the Debtor and All Parties in Interest shall be enjoined from commencing or continuing any Released Claims against the Released Parties.

a.    **Rule 3016(c) Declaration.** In accordance with the requirements of Rule 3016(c), the provisions of Article VIII under the Plan and this Article V operate to specifically release the Released Parties from all claims and enjoin certain acts in connection with such release. Such release and injunctions cover the Released Parties whose contributions are so critical to the reorganization effort that without them the reorganization would fail. From and after the Confirmation Date, the Releases described herein shall become effective and the

Debtor, All Parties in Interest, Unsecured Creditors, and Equity Security Holders shall be enjoined from commencing or continuing any Released Claims against the Released Parties. Within this Section **bold print and italics** are used to identify the exact nature of releases and to identify the parties subject to the release.

b.     *General Releases by the Debtor and Interested Parties.*

*On the Effective Date, in consideration for respective waivers and payment of Unsecured Claims,* ***the Debtor, All Parties in Interest, Unsecured Creditors and Equity Security Holders*** *will be deemed to forever release, waive, discontinue, and discharge all existing and future claims, obligations, proceedings, suits, judgments, damages, demands, debts, rights, causes of action, objection to the Claims and liabilities that are based in whole or in part on any act, failure to act, omission, transaction, or other occurrence taking place on or prior to the Effective Date that* ***the Debtor, All Parties in Interest, Unsecured Creditors and Equity Security Holders*** *has, had, or may have against the Released Parties. Notwithstanding the above, SunTrust Bank does not generally release Chicago Title, but releases Chicago Title only with respect to the claims of the Deposit Claimants. Nor does SunTrust Bank release the Debtor or the Kalidas Parties.*

c.     *Injunction Related to Releases.*

*Except as expressly provided in the Plan or to otherwise enforce the terms of the Plan as of the Confirmation Date,* ***the Debtor and All Parties in Interest, including Unsecured Creditors and Equity Security Holders****, to the fullest extent permitted by applicable law, ~~is~~are permanently enjoined from taking any of the following actions on account of any such discharged Claims, debts, liabilities, terminated, Interests, or rights: (i) commencing or continuing in any manner any action or proceeding against the Released Parties or his*

*respective property, other than to enforce any right, pursuant to the Plan, to a distribution; (ii)*
*enforcing, attaching, collecting or recovering in any manner any judgment, award, decree or*
*order against the Released Parties; (iii) creating, perfecting, or enforcing any lien or*
*encumbrance against the Released Parties, including any equitable lien against the Real*
*Property; (iv) asserting a setoff, right of subrogation or recoupment of any kind against any*
*debt, liability, or obligation due to the Released Parties; and (v) commencing or continuing any*
*action, in any manner, in any place that does not comply with or is inconsistent with the*
*provisions of the Plan.* **Notwithstanding the above,** *SunTrust Bank is not enjoined from taking*
*action against Chicago Title, except with respect to the actions arising from the claims of the*
*Deposit Claimants.* **Nor** *is SunTrust Bank enjoined from taking actions against the Debtor or the*
*Kalidas Parties for the obligations of the Debtor or the Kalidas Parties arising from the Plan or*
*the restructured debt and reaffirmed guarantees.*

## VI.    ALTERNATIVE TO THE PLAN.

If the Plan is not confirmed and consummated, the Debtors believe that the most likely
alternative is a liquidation of the Debtor under Chapter 7 or 11 of the Code. The Debtor believes
that any liquidation is a much less attractive alternative to Creditors. However, whether a
Chapter 7, or Chapter 11 liquidation, the Creditors holding Allowed Class 3 and 4 Claims would
be greatly diluted. Debtor believes that liquidation of all personal property in a Chapter 7
scenario would dramatically reduce the total amount available to Creditors. In a case under
Chapter 7 of the Code, a trustee would be elected or appointed to liquidate the assets of the
Debtor for distribution to Creditors in accordance with the priorities established by the Code.
The Debtor's analysis of the probable recovery to Creditors and holders of equity Interest is set
forth in the Liquidation Analysis.

## VII.  CONCLUSION.

The Debtor recommends that holders of Claims vote to accept the Plan.


DATED this 25th day of February 2010, in Orlando, Florida.

/s/ Elizabeth A. Green
_____
Elizabeth Green, Esquire
Florida Bar No. 0600547
Jimmy D. Parrish, Esquire
Florida Bar No. 526401
**BAKER & HOSTETLER, LLP**
200 S. Orange Avenue
SunTrust Center, Suite 2300
Orlando, Florida 32801
Tel: (407)649-4000
Fax: (407)841-0168
Email: egreen@bakerlaw.com
Email: jparrish@bakerlaw.com
Attorneys for KA and KM Development, Inc.

EXHIBIT "A"

TO AMENDED DISCLOSURE STATEMENT

KA AND KM DEVELOPMENT, INC.
CASE NO.: 6:09-bk-06245-KSJ


5 YEAR PROJECTIONS
(for years 2010, 2011, 2012, 2013 and 2014)

**2010 - OPERATING BUDGET**

PROPERTY: Lake Eve Resort  
LOCATION:  
# OF ROOMS: 176  

APPROVED BY:  
GEN. MGR. Dan Rutan  
DATE:  

| DESCRIPTION | JAN | FEB | MAR | APR | MAY | JUN | JUL | AUG | SEPT | OCT | NOV | DEC | TOTAL | % |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **STATISTICS** | | | | | | | | | | | | | | |
| Rooms Available | 5,456 | 4,928 | 5,456 | 5,280 | 5,456 | 5,280 | 5,456 | 5,456 | 5,280 | 5,456 | 5,280 | 5,456 | 64,240 | |
| Rooms Occupied | 3,680 | 3,486 | 3,900 | 3,950 | 3,400 | 4,100 | 4,150 | 3,650 | 2,800 | 4,100 | 3,725 | 3,900 | 44,841 | |
| % Occupancy | 67.4% | 70.7% | 71.5% | 74.8% | 62.3% | 77.7% | 76.1% | 66.9% | 53.0% | 75.1% | 70.5% | 71.5% | 69.8% | |
| Average Daily Rate | 89.67 | 95.50 | 102.46 | 100.68 | 101.74 | 105.32 | 108.31 | 92.44 | 85.93 | 100.88 | 102.99 | 98.38 | 99.16 | |
| RevPAR | 60.48 | 67.56 | 73.24 | 75.32 | 63.40 | 81.78 | 82.39 | 61.84 | 45.57 | 75.81 | 72.66 | 70.33 | 69.21 | |
| **REVENUES** | | | | | | | | | | | | | | |
| Room Revenue | 329,986 | 332,915 | 399,600 | 397,700 | 345,900 | 431,800 | 449,500 | 337,400 | 240,600 | 413,600 | 383,625 | 383,700 | 4,446,326 | 88.3% |
| Food & Banquet | 17,263 | 18,347 | 21,907 | 23,081 | 24,914 | 25,624 | 27,026 | 21,342 | 17,980 | 24,131 | 23,770 | 26,958 | 272,343 | 5.4% |
| Beverage | 3,425 | 3,425 | 3,425 | 3,825 | 4,555 | 4,555 | 4,555 | 4,155 | 3,355 | 4,555 | 4,555 | 4,555 | 48,940 | 1.0% |
| Telephone Dept | 147 | 139 | 156 | 158 | 136 | 164 | 165 | 146 | 112 | 164 | 156 | 156 | 1,794 | 0.0% |
| Other Income | 21,660 | 20,545 | 22,925 | 23,213 | 20,050 | 24,075 | 24,363 | 21,488 | 16,600 | 24,075 | 21,919 | 22,925 | 263,826 | 5.2% |
| **TOTAL REVENUE** | 372,481 | 375,371 | 448,013 | 447,977 | 395,555 | 485,218 | 505,610 | 384,531 | 278,647 | 466,525 | 434,018 | 438,294 | 5,033,238 | 100.0% |
| **DEPARTMENTAL EXPENSE** | | | | | | | | | | | | | | |
| Rooms Department | 74,416 | 69,709 | 77,055 | 79,742 | 70,915 | 79,238 | 84,045 | 74,598 | 63,158 | 82,361 | 74,650 | 77,498 | 907,386 | 20.4% |
| Food & Banquet | 17,994 | 17,021 | 19,582 | 19,778 | 19,167 | 19,516 | 21,026 | 18,199 | 15,609 | 20,692 | 20,058 | 20,068 | 232,041 | 85.2% |
| Beverage | 2,146 | 2,004 | 2,127 | 2,387 | 2,399 | 2,335 | 2,628 | 2,314 | 2,080 | 2,555 | 2,362 | 2,396 | 27,734 | 56.7% |
| Telephone Dept | 1,766 | 1,673 | 1,872 | 1,896 | 1,632 | 1,968 | 1,992 | 1,344 | 1,344 | 1,968 | 1,788 | 1,788 | 21,524 | 0.4% |
| **TOTAL DEPT EXPENSES** | 96,323 | 90,407 | 100,636 | 103,803 | 94,113 | 103,058 | 109,691 | 96,455 | 82,191 | 107,576 | 98,858 | 101,750 | 1,188,684 | 23.6% |
| **OVERHEAD EXPENSES** | | | | | | | | | | | | | | |
| Admin & General | 41,709 | 32,676 | 33,336 | 37,616 | 34,927 | 38,489 | 39,001 | 35,237 | 36,480 | 38,438 | 38,614 | 38,614 | 447,471 | 8.9% |
| Sales & Marketing | 23,500 | 20,965 | 16,289 | 14,720 | 21,866 | 13,152 | 29,679 | 13,691 | 16,067 | 13,886 | 12,984 | 21,420 | 218,221 | 4.3% |
| Energy | 33,304 | 31,548 | 35,295 | 35,748 | 30,770 | 37,105 | 37,558 | 33,033 | 25,340 | 37,105 | 33,711 | 35,295 | 405,811 | 8.1% |
| Maintenance | 22,982 | 15,853 | 18,506 | 23,727 | 16,838 | 18,421 | 24,538 | 17,162 | 12,814 | 24,141 | 16,813 | 18,661 | 235,455 | 4.7% |
| Total Overhead | 121,494 | 101,043 | 108,426 | 111,811 | 104,401 | 107,168 | 131,675 | 99,123 | 95,701 | 113,569 | 98,557 | 113,991 | 1,306,958 | 26.0% |
| %Gross Revenue | 32.6% | 26.9% | 24.2% | 25.0% | 26.4% | 22.0% | 26.0% | 25.8% | 34.3% | 24.3% | 22.7% | 26.0% | 26.0% | |
| **Gross Operating Profit** | 154,664 | 183,921 | 238,952 | 232,363 | 197,041 | 275,992 | 263,143 | 185,545 | 96,754 | 245,380 | 238,373 | 222,469 | 2,537,596 | 50.4% |
| %Gross Revenue | 41.5% | 49.0% | 53.3% | 51.9% | 49.8% | 56.8% | 52.0% | 48.3% | 34.7% | 52.6% | 54.9% | 50.8% | 50.4% | |
| **FIXED EXPENSES** | | | | | | | | | | | | | | |
| Management Fees | 11,072 | 11,158 | 13,338 | 13,325 | 11,730 | 14,450 | 15,032 | 11,411 | 8,259 | 13,859 | 12,884 | 13,012 | 149,529 | 3.0% |
| Property Taxes | 47,500 | 47,500 | 47,500 | 47,500 | 47,500 | 47,500 | 47,500 | 47,500 | 47,500 | 47,500 | 47,500 | 47,500 | 570,000 | 11.3% |
| Property & Casualty Insurance | 10,000 | 10,000 | 10,000 | 10,000 | 10,000 | 10,000 | 10,000 | 10,000 | 10,000 | 10,000 | 10,000 | 10,000 | 120,000 | 2.4% |
| Other Fixed Expenses | - | | | | | | | | | | | | | 0.0% |
| FF&E Reserves | 11,072 | 11,158 | 13,338 | 13,325 | 11,730 | 14,450 | 15,032 | 11,411 | 8,259 | 13,859 | 12,884 | 13,012 | 149,529 | 3.0% |
| **Total Fixed Expenses** | 79,643 | 79,817 | 84,175 | 84,149 | 80,960 | 86,400 | 87,563 | 80,323 | 74,018 | 85,218 | 83,268 | 83,524 | 989,058 | 19.7% |
| %Gross Revenue | 21.4% | 21.3% | 18.8% | 18.8% | 20.5% | 17.8% | 17.3% | 20.9% | 26.6% | 18.3% | 19.2% | 19.1% | 19.7% | |
| **Net Operating Income** | 75,020 | 104,104 | 154,776 | 148,214 | 116,081 | 189,593 | 175,580 | 108,222 | 22,737 | 160,161 | 155,105 | 138,944 | 1,548,538 | 30.8% |
| %Gross Revenue | 20.1% | 27.7% | 34.5% | 33.1% | 29.3% | 39.0% | 34.7% | 28.1% | 8.2% | 34.3% | 35.7% | 31.7% | 30.8% | |
| **Debt Service** | | | | | | | | | | | | | | |
| A Note Interest Expense (assumed at 6%) | 90,000 | 90,000 | 90,000 | 90,000 | 90,000 | 90,000 | 90,000 | 90,000 | 90,000 | 90,000 | 90,000 | 90,000 | | |
| B Note Interest Expense | | | | | | | | | - | | | | | |
| **Total Debt Service** | | | | | | | | | 57,737 | | | | | |
| **Cash after Debt Service** | | | | | | | | | | | | | | |
| Starting Cash Balance | 258,880 | 148,214 | 116,081 | 108,222 | | | | | | | | | | |
| Plus Net Operating Income | 90,000 | | | | | | | | 90,000 | | | | | |
| **Cash after Debt Service** | 125,000 | 125,000 | 125,000 | 125,000 | 125,000 | 125,000 | 125,000 | 125,000 | 57,737 | 125,000 | 125,000 | 125,000 | 123,000 | |

| | | | | PROPERTY: Lake Eve Resort | | | | APPROVED BY: | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **2011 - OPERATING BUDGET** | | | | LOCATION: | | | | GEN. MGR. | Dan Rutan | | | | |
| | | | | # OF ROOMS: | 176 | | | DATE: | | | | | |

| DESCRIPTION | JAN | FEB | MAR | APR | MAY | JUN | JUL | AUG | SEPT | OCT | NOV | DEC | TOTAL | % |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **STATISTICS** | | | | | | | | | | | | | | |
| Rooms Available | 5,456 | 4,928 | 5,456 | 5,280 | 5,456 | 5,280 | 5,456 | 5,456 | 5,280 | 5,456 | 5,280 | 5,456 | 64,240 | |
| Rooms Occupied | 3,680 | 3,661 | 4,200 | 4,150 | 3,400 | 4,300 | 4,150 | 3,650 | 2,800 | 4,100 | 3,725 | 3,900 | 45,716 | |
| % Occupancy | 67.4% | 74.3% | 77.0% | 78.6% | 62.3% | 81.4% | 76.1% | 66.9% | 53.0% | 75.1% | 71.5% | 71.5% | 71.2% | |
| Average Daily Rate | 89.67 | 98.15 | 103.21 | 102.14 | 101.74 | 106.65 | 109.10 | 93.19 | 86.11 | 102.49 | 103.79 | 99.15 | 100.19 | |
| RevPAR | 60.48 | 72.91 | 79.45 | 80.28 | 63.40 | 86.86 | 82.98 | 62.34 | 45.98 | 77.02 | 73.22 | 70.88 | 71.30 | |
| **REVENUES** | | | | | | | | | | | | | | |
| Room Revenue | 329,986 | 359,315 | 433,500 | 423,900 | 345,900 | 458,600 | 452,750 | 340,150 | 242,800 | 420,200 | 386,600 | 386,700 | 4,580,401 | 88.6% |
| Food & Banquet | 17,263 | 18,347 | 21,907 | 24,914 | 25,624 | 27,026 | 22,126 | 17,980 | 17,280 | 24,131 | 23,770 | 26,958 | 272,343 | 5.3% |
| Beverage | 3,425 | 3,425 | 3,425 | 3,825 | 4,555 | 4,555 | 4,555 | 4,155 | 3,355 | 4,555 | 4,555 | 4,555 | 48,940 | 0.9% |
| Telephone Dept | 147 | 146 | 168 | 146 | 136 | 172 | 166 | 146 | 112 | 164 | 149 | 156 | 1,829 | 0.0% |
| Other Income | 21,660 | 21,551 | 24,650 | 24,363 | 20,050 | 25,225 | 24,563 | 21,488 | 16,600 | 24,075 | 21,939 | 22,925 | 268,867 | 5.2% |
| **TOTAL REVENUE** | 372,481 | 402,784 | 483,650 | 475,335 | 395,555 | 514,176 | 508,860 | 387,281 | 280,847 | 473,125 | 436,993 | 441,294 | 5,172,380 | 100.0% |
| **DEPARTMENTAL EXPENSE** | | | | | | | | | | | | | | |
| Rooms Department | 74,416 | 72,025 | 81,025 | 82,389 | 70,915 | 81,885 | 84,045 | 74,598 | 63,158 | 82,361 | 74,650 | 77,498 | 918,966 | 20.1% |
| Food & Banquet | 17,994 | 17,082 | 19,687 | 19,848 | 19,167 | 19,586 | 18,199 | 18,199 | 17,814 | 20,692 | 20,068 | 20,068 | 232,347 | 85.3% |
| Beverage | 2,146 | 2,004 | 2,127 | 2,387 | 2,399 | 2,335 | 2,628 | 2,314 | 2,080 | 2,555 | 2,362 | 2,396 | 27,734 | 56.7% |
| Telephone Dept | 1,766 | 1,757 | 2,016 | 1,992 | 1,632 | 2,064 | 1,992 | 1,752 | 1,344 | 1,968 | 1,788 | 1,829 | 21,944 | |
| TOTAL DEPT EXPENSES | 96,323 | 92,869 | 104,855 | 106,616 | 94,113 | 105,871 | 110,791 | 96,863 | 86,192 | 107,576 | 97,088 | 101,835 | 1,200,990 | 23.2% |
| %Gross Revenue | 25.9% | 23.1% | 21.7% | 22.4% | 23.8% | 20.6% | 21.8% | 25.0% | 30.7% | 22.7% | 22.2% | 23.1% | 23.2% | |
| **OVERHEAD EXPENSES** | | | | | | | | | | | | | | |
| Admin & General | 41,709 | 33,084 | 38,892 | 38,032 | 34,927 | 38,913 | 39,941 | 35,272 | 36,508 | 38,520 | 35,086 | 38,652 | 449,534 | 8.7% |
| Sales & Marketing | 23,500 | 20,965 | 16,289 | 14,720 | 21,866 | 13,152 | 29,679 | 13,691 | 16,067 | 13,886 | 12,984 | 21,420 | 218,221 | 4.2% |
| Energy | 33,304 | 33,132 | 38,010 | 37,558 | 30,770 | 38,915 | 37,538 | 33,033 | 25,340 | 37,105 | 33,711 | 35,295 | 413,730 | 8.0% |
| Maintenance | 22,982 | 15,988 | 18,737 | 23,881 | 16,838 | 18,575 | 24,538 | 17,162 | 17,814 | 24,141 | 16,813 | 18,660 | 236,129 | 4.6% |
| Total Overhead | 121,494 | 103,169 | 111,928 | 114,191 | 104,401 | 109,556 | 131,716 | 99,157 | 95,728 | 113,652 | 98,594 | 114,028 | 1,317,614 | 25.5% |
| %Gross Revenue | 32.6% | 25.6% | 23.1% | 24.0% | 26.4% | 21.3% | 25.9% | 25.6% | 34.1% | 24.0% | 22.6% | 25.8% | 25.5% | |
| Gross Operating Profit | 154,664 | 206,747 | 266,867 | 254,528 | 197,041 | 298,750 | 266,353 | 191,261 | 98,927 | 251,897 | 241,311 | 225,431 | 2,653,776 | 51.3% |
| %Gross Revenue | 41.5% | 51.3% | 55.2% | 53.5% | 49.8% | 58.1% | 52.3% | 49.4% | 35.2% | 53.2% | 55.2% | 51.1% | 51.3% | |
| **FIXED EXPENSES** | | | | | | | | | | | | | | |
| Management Fees | 11,072 | 11,981 | 14,407 | 14,145 | 11,730 | 15,289 | 15,129 | 11,494 | 8,325 | 14,057 | 12,973 | 13,102 | 153,703 | 3.0% |
| Property Taxes | 47,500 | 47,500 | 47,500 | 47,500 | 47,500 | 47,500 | 47,500 | 47,500 | 47,500 | 47,500 | 47,500 | 47,500 | 570,000 | 11.0% |
| Property & Casualty Insurance | 10,000 | 10,000 | 10,000 | 10,000 | 10,000 | 10,000 | 10,000 | 10,000 | 10,000 | 10,000 | 10,000 | 10,000 | 120,000 | 2.3% |
| Other Fixed Expenses | - | - | - | - | - | - | - | - | - | - | - | - | - | 0.0% |
| FF&E Reserves | 11,072 | 11,981 | 14,407 | 14,145 | 11,730 | 15,289 | 15,129 | 11,494 | 8,325 | 14,057 | 12,973 | 13,102 | 153,703 | 3.0% |
| Total Fixed Expenses | 79,643 | 81,462 | 86,314 | 85,791 | 80,960 | 88,077 | 87,758 | 80,488 | 74,150 | 85,614 | 83,446 | 83,704 | 997,407 | 19.3% |
| %Gross Revenue | 21.4% | 20.2% | 17.8% | 18.0% | 20.5% | 17.1% | 17.2% | 20.8% | 26.4% | 18.1% | 19.1% | 19.0% | 19.3% | |
| Net Operating Income | 75,020 | 125,285 | 180,553 | 168,737 | 116,081 | 210,673 | 178,594 | 110,773 | 24,777 | 166,283 | 157,865 | 141,727 | 1,656,369 | 32.0% |
| %Gross Revenue | 20.1% | 31.1% | 37.3% | 35.5% | 29.3% | 41.0% | 35.1% | 28.6% | 8.8% | 35.1% | 36.1% | 32.1% | 32.0% | |
| Starting Cash Balance | 75,020 | 125,285 | 200,306 | 305,839 | 474,576 | 533,673 | 303,594 | 235,773 | 149,777 | 226,060 | 282,865 | 266,727 | | |
| Plus Net Operating Income | | | | | | | | | | | | | | |
| **Debt Service** | | | | | | | | | | | | | | |
| A Note Interest Expense (assumed at 6%) | 90,000 | 90,000 | 165,859 | 255,576 | 116,081 | 120,673 | 88,594 | 20,773 | - | 11,060 | 67,865 | 51,727 | 997,046 | |
| B Note Interest Expense | - | 90,000 | 90,000 | 90,000 | 90,000 | 90,000 | 90,000 | 90,000 | 90,000 | 90,000 | 90,000 | 90,000 | | |
| Total Debt Service | 90,000 | 90,000 | 125,000 | 125,000 | 125,000 | 125,000 | 125,000 | 125,000 | 59,777 | 125,000 | 125,000 | 125,000 | | |
| Cash after Debt Service | 110,020 | 110,306 | 125,000 | 125,000 | 125,000 | 125,000 | 125,000 | 125,000 | 59,777 | 125,000 | 125,000 | 125,000 | | |

# 2012 - OPERATING BUDGET

**PROPERTY:** Lake Eve Resort  
**LOCATION:**  
**# OF ROOMS:** 176  
**APPROVED BY:** Dan Rutan  
**GEN. MGR.**  
**DATE:**

| DESCRIPTION | JAN | FEB | MAR | APR | MAY | JUN | JUL | AUG | SEPT | OCT | NOV | DEC | TOTAL | % |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **STATISTICS** | | | | | | | | | | | | | | |
| Rooms Available | 5,456 | 4,928 | 5,456 | 5,280 | 5,456 | 5,280 | 5,456 | 5,456 | 5,280 | 5,456 | 5,280 | 5,456 | 64,240 | |
| Rooms Occupied | 3,748 | 3,750 | 4,250 | 4,300 | 3,500 | 4,500 | 4,267 | 3,705 | 2,955 | 4,190 | 3,775 | 3,900 | 46,820 | |
| % Occupancy | 68.7% | 76.1% | 77.9% | 81.4% | 64.1% | 85.2% | 78.2% | 67.9% | 56.0% | 76.8% | 71.5% | 71.5% | | |
| Average Daily Rate | 93.02 | 98.55 | 103.36 | 102.70 | 102.23 | 107.20 | 109.53 | 93.28 | 86.69 | 102.76 | 103.93 | 99.15 | | |
| RevPAR | 63.90 | 74.99 | 80.52 | 83.64 | 65.58 | 91.36 | 85.66 | 63.34 | 48.52 | 78.91 | 74.31 | 70.88 | | |
| **REVENUES** | | | | | | | | | | | | | | |
| Room Revenue | 348,656 | 369,550 | 439,300 | 441,600 | 357,800 | 482,400 | 467,375 | 345,595 | 256,165 | 430,550 | 392,350 | 386,700 | 4,718,041 | 88.7% |
| Food & Banquet | 17,263 | 18,347 | 21,907 | 24,914 | 25,624 | 27,026 | 22,167 | 21,342 | 17,980 | 24,131 | 26,958 | 24,684 | 272,343 | 5.1% |
| Beverage | 3,425 | 3,425 | 3,425 | 3,825 | 4,555 | 4,555 | 4,555 | 4,155 | 3,355 | 4,555 | 4,555 | 4,555 | 48,940 | 0.9% |
| Telephone Dept | 150 | 150 | 170 | 172 | 140 | 180 | 171 | 168 | 117 | 168 | 151 | 156 | 1,873 | 0.0% |
| Other Income | 22,051 | 22,063 | 24,938 | 25,225 | 20,625 | 26,375 | 25,035 | 21,804 | 17,376 | 24,333 | 22,925 | 22,925 | 275,215 | 5.2% |
| **TOTAL REVENUE** | 391,545 | 413,535 | 489,740 | 495,903 | 408,034 | 539,134 | 524,162 | 393,044 | 294,994 | 483,996 | 441,032 | 441,294 | 5,316,412 | 100.0% |
| **DEPARTMENTAL EXPENSE** | | | | | | | | | | | | | | |
| Rooms Department | 75,316 | 73,203 | 81,687 | 84,374 | 72,238 | 84,532 | 85,594 | 75,326 | 64,945 | 83,552 | 75,312 | 77,498 | 933,577 | 19.8% |
| Food & Banquet | 18,018 | 17,113 | 19,705 | 19,900 | 19,202 | 19,656 | 21,667 | 18,218 | 19,657 | 20,724 | 20,068 | 18,805 | 232,733 | 85.5% |
| Beverage | 2,146 | 2,004 | 2,127 | 2,387 | 2,399 | 2,335 | 2,628 | 2,314 | 2,080 | 2,555 | 2,362 | 2,396 | 27,733 | 56.7% |
| Energy | 33,919 | 33,938 | 38,463 | 38,915 | 31,675 | 40,725 | 38,616 | 33,530 | 26,562 | 37,920 | 35,180 | 35,295 | 423,721 | 8.0% |
| Telephone Dept | 1,799 | 1,800 | 2,040 | 2,064 | 1,680 | 2,160 | 2,048 | 1,778 | 1,409 | 2,011 | 1,812 | 1,873 | 22,474 | 0.4% |
| Maintenance | 23,034 | 16,057 | 18,775 | 16,951 | 16,915 | 13,729 | 24,628 | 17,204 | 17,918 | 24,210 | 16,852 | 21,420 | 236,979 | 4.5% |
| Total Overhead | 122,426 | 104,210 | 112,514 | 115,951 | 105,576 | 111,905 | 133,099 | 99,790 | 99,282 | 114,705 | 97,179 | 114,028 | 1,330,664 | 25.0% |
| %Gross Revenue | 31.3% | 25.2% | 23.0% | 23.4% | 25.9% | 20.8% | 25.4% | 25.4% | 33.0% | 23.7% | 22.0% | 25.8% | 25.0% | |
| **TOTAL DEPT EXPENSES** | 97,299 | 94,120 | 105,558 | 108,725 | 95,519 | 108,684 | 112,437 | 97,636 | 88,090 | 108,842 | 97,791 | 101,835 | 1,216,518 | 22.9% |
| **Gross Operating Profit** | 171,840 | 215,204 | 271,668 | 269,226 | 206,939 | 318,545 | 278,626 | 195,618 | 109,622 | 260,449 | 246,062 | 225,431 | 2,769,230 | 52.1% |
| %Gross Revenue | 43.9% | 52.0% | 55.5% | 54.3% | 50.7% | 59.1% | 53.2% | 49.8% | 37.2% | 53.8% | 55.5% | 51.1% | 52.1% | |
| **OVERHEAD EXPENSES** | | | | | | | | | | | | | | |
| Admin & General | 11,973 | 13,251 | 14,589 | 14,589 | 12,104 | 14,720 | 16,037 | 13,691 | 16,067 | 13,886 | 12,984 | 13,102 | | |
| Sales & Marketing | 23,500 | 20,965 | 16,289 | 14,720 | 21,866 | 13,132 | 29,679 | 13,691 | 16,067 | 13,886 | 12,984 | 21,420 | 218,211 | 4.1% |
| Property Taxes | | | | | | | | | | | | | | |
| Franchise Fees | 10,000 | 10,000 | 10,000 | 10,000 | 10,000 | 10,000 | 10,000 | 10,000 | 10,000 | 10,000 | 10,000 | 10,000 | 120,000 | 2.3% |
| **Net Operating Income** | 91,053 | 133,098 | 184,989 | 182,322 | 125,230 | 228,970 | 189,949 | 114,785 | 34,624 | 174,183 | 162,253 | 141,727 | 1,763,182 | 33.2% |
| %Gross Revenue | 23.3% | 32.2% | 37.8% | 36.8% | 30.7% | 42.5% | 36.2% | 29.2% | 11.7% | 36.0% | 36.8% | 32.1% | 33.2% | |
| **FIXED EXPENSES** | | | | | | | | | | | | | | |
| Management Fees | 11,644 | 12,303 | 14,589 | 14,702 | 12,104 | 16,037 | 15,588 | 11,667 | 8,749 | 14,383 | 13,154 | 13,102 | 158,024 | 3.0% |
| Property Taxes | 47,500 | 47,500 | 47,500 | 47,500 | 47,500 | 47,500 | 47,500 | 47,500 | 47,500 | 47,500 | 47,500 | 47,500 | 570,000 | 10.7% |
| Property & Casualty Insurance | 10,000 | 10,000 | 10,000 | 10,000 | 10,000 | 10,000 | 10,000 | 10,000 | 10,000 | 10,000 | 10,000 | 10,000 | 120,000 | 2.3% |
| Other Fixed Expenses | - | - | - | - | - | - | - | - | - | - | - | - | - | 0.0% |
| FF&E Reserves | 11,644 | 12,303 | 14,589 | 14,702 | 12,104 | 16,037 | 15,588 | 11,667 | 8,749 | 14,383 | 13,154 | 13,102 | 158,024 | 3.0% |
| **Total Fixed Expenses** | 80,787 | 82,107 | 86,679 | 86,905 | 81,709 | 89,575 | 88,676 | 80,833 | 74,998 | 86,266 | 83,809 | 83,704 | 1,006,048 | 18.9% |
| %Gross Revenue | 20.6% | 19.9% | 17.7% | 17.6% | 20.0% | 16.6% | 16.9% | 20.6% | 25.4% | 17.8% | 18.9% | 19.0% | 18.9% | |
| **Net Operating Income** | 91,053 | 133,098 | 184,989 | 182,322 | 125,230 | 228,970 | 189,949 | 114,785 | 34,624 | 174,183 | 162,253 | 141,727 | 1,763,182 | 33.2% |
| %Gross Revenue | 23.3% | 32.2% | 37.8% | 36.8% | 30.7% | 42.5% | 36.2% | 29.2% | 11.7% | 36.0% | 36.8% | 32.1% | 33.2% | |
| Starting Cash Balance | 216,053 | 224,150 | 409,139 | 500,408 | 250,230 | 353,970 | 314,749 | 239,785 | 159,024 | 287,253 | 266,727 | 266,727 | | |
| Plus Net Operating Income | 91,053 | 133,098 | 184,989 | 182,322 | 125,230 | 228,970 | 189,949 | 114,785 | 34,624 | 174,183 | 162,253 | 141,727 | | |
| **Debt Service** | | | | | | | | | | | | | | |
| A Note Interest Expense (assumed at 6%) | 90,000 | 90,000 | 90,000 | 90,000 | 90,000 | 90,000 | 90,000 | 90,000 | 90,000 | 90,000 | 90,000 | 90,000 | 1,080,000 | |
| B Note Interest Expense | 1,053 | 9,150 | 194,139 | 285,408 | 35,230 | 138,970 | 99,049 | 24,785 | - | 72,253 | 51,727 | 26,727 | | |
| **Total Debt Service** | 91,053 | 99,150 | 284,139 | 375,408 | 125,230 | 228,970 | 189,049 | 114,785 | 90,000 | 162,253 | 141,727 | 116,727 | | |
| **Cash after Debt Service** | 125,000 | 125,000 | 125,000 | 125,000 | 125,000 | 125,000 | 125,000 | 125,000 | 125,000 | 125,000 | 125,000 | 125,000 | 125,000 | |

# 2013 - OPERATING BUDGET

**PROPERTY:** Lake Eve Resort  
**LOCATION:**  
**# OF ROOMS:** 176  
**APPROVED BY:** Dan Rutan  
**GEN. MGR.**  
**DATE:**

| DESCRIPTION | JAN | FEB | MAR | APR | MAY | JUN | JUL | AUG | SEPT | OCT | NOV | DEC | TOTAL | % |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **STATISTICS** | | | | | | | | | | | | | | |
| Rooms Available | 5,456 | 4,928 | 5,456 | 5,280 | 5,456 | 5,280 | 5,456 | 5,456 | 5,280 | 5,456 | 5,280 | 5,456 | 64,240 | |
| Rooms Occupied | 3,930 | 4,050 | 4,450 | 4,400 | 3,750 | 4,500 | 4,267 | 3,705 | 2,935 | 4,190 | 3,775 | 3,900 | 47,852 | |
| % Occupancy | 72.0% | 82.2% | 81.6% | 83.3% | 68.7% | 85.2% | 78.2% | 67.9% | 55.6% | 76.8% | 71.5% | 71.5% | 74.5% | |
| Average Daily Rate | 95.50 | 99.44 | 104.92 | 103.41 | 102.95 | 108.53 | 111.06 | 93.28 | 87.28 | 102.76 | 103.93 | 99.15 | 101.56 | |
| RevPAR | 68.79 | 81.73 | 85.58 | 86.17 | 70.76 | 92.50 | 86.85 | 63.34 | 48.52 | 78.91 | 74.31 | 70.88 | 75.65 | |
| **REVENUES** | | | | | | | | | | | | | | |
| Room Revenue | 375,300 | 402,750 | 466,900 | 455,000 | 386,050 | 488,400 | 473,875 | 345,595 | 256,165 | 430,550 | 392,350 | 386,700 | 4,859,635 | 88.9% |
| Food & Banquet | 17,263 | 18,347 | 21,907 | 23,081 | 24,914 | 25,624 | 27,026 | 21,342 | 17,980 | 24,131 | 23,770 | 26,958 | 272,343 | 5.0% |
| Beverage | 3,425 | 3,425 | 3,425 | 3,825 | 4,555 | 4,555 | 4,555 | 4,155 | 3,355 | 4,555 | 4,555 | 4,555 | 48,940 | 0.9% |
| Telephone Dept | 157 | 162 | 178 | 176 | 150 | 180 | 171 | 148 | 117 | 168 | 151 | 156 | 1,914 | 0.0% |
| Other Income | 23,098 | 23,788 | 26,088 | 25,800 | 22,063 | 26,375 | 25,035 | 21,804 | 17,376 | 24,593 | 22,206 | 22,925 | 281,149 | 5.1% |
| TOTAL REVENUE | 419,243 | 448,472 | 518,498 | 507,882 | 437,732 | 545,134 | 530,662 | 393,044 | 294,994 | 483,996 | 443,032 | 441,294 | 5,465,981 | 100.0% |
| **DEPARTMENTAL EXPENSE** | | | | | | | | | | | | | | |
| Rooms Department | 77,725 | 77,173 | 84,334 | 85,697 | 75,547 | 84,532 | 85,594 | 75,326 | 64,945 | 83,552 | 75,312 | 77,498 | 947,235 | 19.5% |
| Food & Banquet | 18,082 | 17,218 | 19,775 | 19,935 | 19,290 | 19,656 | 22,167 | 18,218 | 19,657 | 20,724 | 18,305 | 20,068 | 233,094 | 85.6% |
| Beverage | 2,146 | 2,004 | 2,127 | 2,387 | 2,399 | 2,335 | 2,628 | 2,314 | 2,080 | 2,555 | 2,362 | 2,396 | 27,734 | 56.6% |
| Telephone Dept | 1,886 | 1,945 | 2,135 | 2,112 | 1,800 | 2,161 | 2,048 | 1,778 | 1,408 | 2,011 | 1,812 | 1,873 | 22,969 | 1200.0% |
| TOTAL DEPT EXPENSES | 99,839 | 98,340 | 108,371 | 110,131 | 99,036 | 108,684 | 112,437 | 97,636 | 88,090 | 108,842 | 97,791 | 101,835 | 1,231,032 | 22.5% |
| %Gross Revenue | 23.8% | 21.9% | 20.9% | 21.7% | 22.6% | 19.9% | 21.2% | 24.8% | 29.9% | 22.5% | 22.1% | 23.1% | 22.5% | |
| **OVERHEAD EXPENSES** | | | | | | | | | | | | | | |
| Admin & General | 42,386 | 33,799 | 39,420 | 38,531 | 35,584 | 39,374 | 40,257 | 35,364 | 36,734 | 38,689 | 35,180 | 38,652 | 453,970 | 8.3% |
| Sales & Marketing | 23,500 | 20,965 | 16,289 | 14,720 | 21,866 | 13,152 | 29,679 | 13,691 | 16,067 | 13,886 | 12,984 | 21,420 | 218,221 | 4.0% |
| Energy | 35,567 | 36,653 | 40,273 | 39,820 | 33,938 | 40,725 | 38,616 | 33,530 | 26,562 | 37,920 | 34,164 | 35,295 | 433,061 | 7.9% |
| Maintenance | 23,174 | 16,288 | 18,929 | 24,073 | 17,107 | 18,729 | 24,628 | 17,204 | 17,918 | 24,210 | 16,851 | 18,661 | 237,773 | 4.4% |
| Total Overhead | 124,627 | 107,704 | 114,911 | 117,145 | 108,494 | 111,980 | 133,181 | 99,790 | 97,281 | 114,705 | 99,179 | 114,028 | 1,343,024 | 24.6% |
| %Gross Revenue | 29.7% | 24.0% | 22.2% | 23.1% | 24.8% | 20.5% | 25.1% | 25.4% | 33.0% | 23.7% | 22.4% | 25.8% | 24.6% | |
| Gross Operating Profit | 194,777 | 242,428 | 295,215 | 280,606 | 230,202 | 324,470 | 285,045 | 195,618 | 109,622 | 260,449 | 246,062 | 225,431 | 2,889,924 | 52.9% |
| %Gross Revenue | 46.5% | 54.1% | 56.9% | 55.3% | 52.6% | 59.5% | 53.7% | 49.8% | 37.2% | 53.8% | 55.5% | 51.1% | 52.9% | |
| **FIXED EXPENSES** | | | | | | | | | | | | | | |
| Management Fees | 12,475 | 13,351 | 15,452 | 15,122 | 12,995 | 16,217 | 15,783 | 11,667 | 8,749 | 14,383 | 13,154 | 13,102 | 162,451 | 3.0% |
| Property Taxes | 47,500 | 47,500 | 47,500 | 47,500 | 47,500 | 47,500 | 47,500 | 47,500 | 47,500 | 47,500 | 47,500 | 47,500 | 570,000 | 10.4% |
| Property & Casualty Insurance | 10,000 | 10,000 | 10,000 | 10,000 | 10,000 | 10,000 | 10,000 | 10,000 | 10,000 | 10,000 | 10,000 | 10,000 | 120,000 | 2.2% |
| Other Fixed Expenses | | | | | | | | | | | | | - | 0.0% |
| FF&E Reserves | 12,475 | 13,351 | 15,452 | 15,122 | 12,995 | 16,217 | 15,783 | 11,667 | 8,749 | 14,383 | 13,154 | 13,102 | 162,451 | 3.0% |
| Total Fixed Expenses | 82,449 | 84,203 | 88,404 | 87,743 | 83,491 | 89,935 | 89,066 | 80,833 | 74,998 | 86,266 | 83,809 | 83,704 | 1,014,902 | 18.6% |
| %Gross Revenue | 19.7% | 18.8% | 17.1% | 17.3% | 19.1% | 16.5% | 16.8% | 20.6% | 25.4% | 17.8% | 18.9% | 19.0% | 18.6% | |
| Net Operating Income | 112,328 | 158,225 | 206,811 | 192,862 | 146,711 | 234,535 | 195,978 | 114,785 | 34,624 | 174,183 | 162,253 | 141,727 | 1,875,022 | 34.3% |
| %Gross Revenue | 26.8% | 35.3% | 39.9% | 38.0% | 33.5% | 43.0% | 36.9% | 29.2% | 11.7% | 36.0% | 36.6% | 32.1% | 34.3% | |
| Starting Cash Balance | 125,000 | 125,000 | 125,000 | 125,000 | 125,000 | 125,000 | 125,000 | 125,000 | 125,000 | 125,000 | 125,000 | 125,000 | 125,000 | |
| Plus Net Operating Income | 112,328 | 158,225 | 206,811 | 192,862 | 146,711 | 234,535 | 195,978 | 114,785 | 34,624 | 174,183 | 162,253 | 141,727 | 1,875,022 | |
| Starting Cash Balance | 237,328 | 283,225 | 331,811 | 317,862 | 271,711 | 359,535 | 320,978 | 239,785 | 159,624 | 299,183 | 287,253 | 266,727 | | |
| **Debt Service** | | | | | | | | | | | | | | |
| A Note Interest Expense (assumed at 6%) | 90,000 | 90,000 | 90,000 | 90,000 | 90,000 | 90,000 | 90,000 | 90,000 | 90,000 | 90,000 | 90,000 | 90,000 | 1,080,000 | |
| B Note Interest Expense | 22,328 | 68,225 | 116,811 | 102,862 | 56,711 | 144,535 | 105,978 | 24,785 | (55,376) | 84,183 | 72,253 | 51,727 | 795,022 | |
| Total Debt Service | 112,328 | 158,225 | 206,811 | 192,862 | 146,711 | 234,535 | 195,978 | 114,785 | 34,624 | 174,183 | 162,253 | 141,727 | 1,875,022 | |
| Cash after Debt Service | 125,000 | 125,000 | 125,000 | 125,000 | 125,000 | 125,000 | 125,000 | 125,000 | 125,000 | 125,000 | 125,000 | 125,000 | 125,000 | |

# 2014 - OPERATING BUDGET

**PROPERTY:** Lake Eve Resort  
**LOCATION:**  
**# OF ROOMS:** 176  
**APPROVED BY:**  
**GEN. MGR.** Dan Rutan  
**DATE:**

| DESCRIPTION | JAN | FEB | MAR | APR | MAY | JUN | JUL | AUG | SEPT | OCT | NOV | DEC | TOTAL | % |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **STATISTICS** | | | | | | | | | | | | | | |
| Rooms Available | 5,456 | 4,928 | 5,456 | 5,280 | 5,456 | 5,280 | 5,456 | 5,456 | 5,280 | 5,456 | 5,280 | 5,456 | 64,240 | |
| Rooms Occupied | 3,980 | 4,100 | 4,500 | 4,450 | 3,800 | 4,600 | 4,267 | 3,705 | 2,935 | 4,230 | 3,775 | 3,900 | 48,242 | |
| %Occupancy | 72.9% | 83.2% | 82.9% | 84.3% | 69.6% | 87.1% | 78.2% | 67.9% | 55.6% | 77.5% | 71.5% | 71.5% | 75.1% | |
| Average Daily Rate | 98.51 | 103.90 | 107.38 | 105.06 | 104.61 | 110.07 | 113.34 | 95.50 | 88.78 | 104.35 | 105.51 | 101.46 | 103.77 | |
| RevPAR | 71.86 | 86.44 | 88.56 | 88.54 | 72.86 | 95.89 | 88.64 | 64.85 | 49.35 | 80.90 | 75.44 | 72.53 | 77.93 | |
| **REVENUES** | | | | | | | | | | | | | | |
| Room Revenue | 392,050 | 426,000 | 483,200 | 467,500 | 397,500 | 506,300 | 483,625 | 353,845 | 260,965 | 441,390 | 398,300 | 395,700 | 5,005,975 | 89.2% |
| Food & Banquet | 17,263 | 18,347 | 21,907 | 24,914 | 25,624 | 27,026 | 22,167 | 21,342 | 17,980 | 24,131 | 23,770 | 26,958 | 272,343 | 4.9% |
| Beverage | 3,425 | 3,425 | 3,425 | 3,825 | 4,555 | 4,555 | 4,555 | 4,155 | 3,355 | 4,555 | 4,555 | 4,555 | 48,940 | 0.9% |
| Telephone Dept | 159 | 164 | 180 | 178 | 152 | 184 | 171 | 148 | 117 | 169 | 151 | 156 | 1,930 | 0.0% |
| Other Income | 23,385 | 24,075 | 26,375 | 26,088 | 22,350 | 26,950 | 25,035 | 21,804 | 17,376 | 24,823 | 22,206 | 22,925 | 283,392 | 5.0% |
| **TOTAL REVENUE** | 436,282 | 472,011 | 535,087 | 520,672 | 449,471 | 563,613 | 540,412 | 401,294 | 299,394 | 495,068 | 448,982 | 450,294 | 5,612,579 | 100.0% |
| **DEPARTMENTAL EXPENSE** | | | | | | | | | | | | | | |
| Rooms Department | 78,386 | 77,835 | 84,996 | 86,359 | 76,209 | 85,856 | 85,594 | 75,326 | 64,945 | 84,081 | 75,312 | 77,498 | 952,397 | 19.0% |
| Food & Banquet | 18,099 | 17,236 | 19,792 | 19,953 | 19,307 | 19,691 | 22,167 | 18,218 | 19,657 | 20,738 | 20,058 | 20,068 | 233,231 | 85.6% |
| Beverage | 2,146 | 2,004 | 2,127 | 2,387 | 2,399 | 2,335 | 2,628 | 2,314 | 2,080 | 2,555 | 2,362 | 2,396 | 27,734 | 56.7% |
| Telephone Dept | 1,910 | 1,968 | 2,160 | 2,136 | 1,824 | 2,208 | 2,043 | 1,778 | 1,409 | 2,030 | 1,812 | 1,812 | 23,156 | 1,200.0% |
| **TOTAL DEPT EXPENSES** | 100,542 | 99,043 | 109,074 | 110,835 | 99,739 | 110,090 | 112,437 | 97,636 | 88,090 | 109,404 | 99,544 | 101,835 | 1,236,518 | 22.0% |
| **OVERHEAD EXPENSES** | | | | | | | | | | | | | | |
| Admin & General | 42,618 | 34,112 | 39,646 | 38,710 | 35,749 | 39,642 | 40,379 | 35,467 | 36,789 | 38,842 | 35,254 | 38,764 | 455,972 | 8.1% |
| Sales & Marketing | 23,500 | 20,965 | 16,289 | 14,720 | 21,866 | 13,152 | 29,679 | 13,691 | 16,067 | 13,886 | 12,984 | 21,420 | 218,221 | 3.9% |
| Energy | 36,019 | 37,105 | 40,725 | 40,273 | 34,390 | 41,630 | 38,616 | 33,530 | 26,562 | 38,282 | 34,164 | 35,295 | 436,590 | 7.8% |
| Maintenance | 23,213 | 16,326 | 18,968 | 24,112 | 17,146 | 18,806 | 24,628 | 17,204 | 17,918 | 24,241 | 16,852 | 18,662 | 238,074 | 4.2% |
| Total Overhead | 125,349 | 108,507 | 115,628 | 117,815 | 109,151 | 113,230 | 133,302 | 99,893 | 97,336 | 115,251 | 99,254 | 114,141 | 1,348,856 | 24.0% |
| %Gross Revenue | 28.7% | 23.0% | 21.6% | 22.6% | 24.3% | 20.1% | 24.7% | 24.9% | 32.5% | 23.3% | 22.1% | 25.3% | 24.0% | |
| **Gross Operating Profit** | 210,391 | 264,461 | 310,385 | 292,022 | 240,582 | 340,293 | 294,673 | 203,765 | 113,967 | 270,412 | 251,938 | 234,318 | 3,027,206 | 53.9% |
| %Gross Revenue | 48.2% | 56.0% | 58.0% | 56.1% | 53.5% | 60.4% | 54.5% | 50.8% | 38.1% | 54.6% | 56.1% | 52.0% | 53.9% | |
| **FIXED EXPENSES** | | | | | | | | | | | | | | |
| Management Fees | 12,986 | 14,058 | 15,950 | 15,505 | 13,347 | 16,772 | 16,076 | 11,914 | 8,881 | 14,715 | 13,333 | 13,372 | 166,909 | 3.0% |
| Property Taxes | 47,500 | 47,500 | 47,500 | 47,500 | 47,500 | 47,500 | 47,500 | 47,500 | 47,500 | 47,500 | 47,500 | 47,500 | 570,000 | 10.2% |
| Property & Casualty Insurance | 10,000 | 10,000 | 10,000 | 10,000 | 10,000 | 10,000 | 10,000 | 10,000 | 10,000 | 10,000 | 10,000 | 10,000 | 120,000 | 2.1% |
| Franchise Fees | - | - | - | - | - | - | - | - | - | - | - | - | - | |
| Other Fixed Expenses | - | - | - | - | - | - | - | - | - | - | - | - | - | |
| FF&E Reserves | 12,986 | 14,058 | 15,950 | 15,505 | 13,347 | 16,772 | 16,076 | 11,914 | 8,881 | 14,715 | 13,333 | 13,372 | 166,909 | 3.0% |
| Total Fixed Expenses | 83,471 | 85,615 | 89,400 | 88,510 | 84,195 | 91,043 | 89,651 | 81,328 | 75,262 | 86,930 | 84,166 | 84,244 | 1,023,818 | 18.2% |
| %Gross Revenue | 19.1% | 18.1% | 16.7% | 17.0% | 18.7% | 16.2% | 16.6% | 20.3% | 25.1% | 17.6% | 18.7% | 18.7% | 18.2% | |
| **Net Operating Income** | 126,919 | 178,845 | 220,985 | 203,511 | 156,387 | 249,249 | 205,021 | 122,436 | 38,705 | 183,482 | 167,772 | 150,074 | 2,003,387 | 35.7% |
| %Gross Revenue | 29.1% | 37.9% | 41.3% | 39.1% | 34.8% | 44.2% | 37.9% | 30.5% | 12.9% | 37.1% | 37.4% | 33.3% | 35.7% | |
| **Debt Service** | | | | | | | | | | | | | | |
| A Note Interest Expense (assumed at 6%) | 90,000 | 90,000 | 90,000 | 90,000 | 90,000 | 90,000 | 90,000 | 90,000 | 90,000 | 90,000 | 90,000 | 90,000 | 1,080,000 | |
| B Note Interest Expense | 36,919 | 90,765 | 311,750 | 388,341 | 66,387 | 159,249 | 115,021 | 32,436 | - | 42,187 | 77,772 | 60,074 | 1,380,901 | |
| Total Debt Service | 126,919 | 180,765 | 401,750 | 478,341 | 156,387 | 249,249 | 205,021 | 122,436 | 90,000 | 132,187 | 167,772 | 150,074 | 2,460,901 | |
| Starting Cash Balance | 125,000 | 125,000 | 125,000 | 125,000 | 125,000 | 125,000 | 125,000 | 125,000 | 125,000 | 125,000 | 125,000 | 125,000 | 125,000 | |
| Cash after Debt Service | 125,000 | 125,000 | 125,000 | 125,000 | 125,000 | 125,000 | 125,000 | 125,000 | 125,000 | 125,000 | 125,000 | 125,000 | 125,000 | |

## EXHIBIT "B"

## TO AMENDED DISCLOSURE STATEMENT

## KA AND KM DEVELOPMENT, INC.
### CASE NO.: 6:09-bk-06245-KSJ

| Asset | Estimated Liquidation Value as of December 31, 2009 |
|---|---|
| Cash | $79,723.17 |
| Personal Property | $3,500,000.00 |
| Accounts Receivable (estimated collectible) | $126,700.13 |
| Real Property | $30,000,000.00 |
| **TOTAL LIQUIDATION** | $33,706,423.30 |
| | |
| Secured Debt | $38,260,000.00 |
| Administrative: Chapter 7 | $40,000.00 |
| Administrative: Chapter 11 | $180,000.00 |
| Priority and Secured Tax Claims | $36,000.00 |
| **TOTAL DEBT** | $38,516,000.00 |
| **AVAILABLE FOR GENERAL UNSECURED CREDITORS** | $0.00 |